---

## In re HOPP.

(District Court, E. D. Wisconsin. May 28, 1910.)

1. ALIENS (§ 62*)—NATURALIZATION—"GOOD MORAL CHARACTER."

"Good moral character," within the provision of the naturalization act (Act June 29, 1906, c. 3592, 34 Stat. 596 [U. S. Comp. St. Supp. 1909, p. 475]), requiring a finding that applicant for citizenship has behaved as a man of good moral character, is such character as measures up to the standard of the average citizen of the community in which applicant resides.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 124; Dec. Dig. § 62.*

For other definitions, see Words and Phrases, vol. 4, p. 3124.]

2. ALIENS (§ 62*)—NATURALIZATION—APPLICANT'S MORAL CHARACTER—SUFFICIENCY.

That applicant for citizenship keeps his saloon open in violation of the state Sunday closing act does not show want of the good moral character essential under the naturalization act (Act June 29, 1906, c. 3592, 34 Stat. 596 [U. S. Comp. St. Supp. 1909, p. 475]), where the law has never been enforced in his city on account of adverse public sentiment, and where he is willing to obey the law if insisted upon by the proper authorities.

[Ed. Note.—For other cases, see Aliens, Cent. Dig. § 124; Dec. Dig. § 62.*]

Petition by Albert Peter Hopp to be admitted to citizenship. Applicant admitted.

H. K. Butterfield, U. S. Atty.

Julius Roehr and Christian Doerfler, for applicant.

QUARLES, District Judge. This is a case arising under the naturalization statute. Act June 29, 1906, c. 3592, 34 Stat. 596 (U. S. Comp. St. Supp. 1909, p. 475). The applicant has complied with all the requirements of the law, and his proofs are satisfactory, unless his answers to certain questions propounded to him, which will be presently considered, are a bar to the application. The following facts were either established by the evidence or conceded upon the argument:

The applicant is a saloon keeper, whose place of business is in the city of Milwaukee, a city having approximately 350,000 inhabitants. It is estimated that 75 per cent. of the population are of foreign birth, and of this number a large proportion are of German extraction. There are, and for many years last past have been, more than 2,000 saloons doing business in Milwaukee. For more than 40 years the state statute, the "Sunday closing act," as it is called, has been

upon the statute book. During all of that time no effort has been made, either by the municipal or state authorities, to enforce that statute within the city of Milwaukee. During all this time these saloons have been kept open on the Sabbath Day, without concealment or disguise. The old German adheres with tenacity to the habits and customs of the fatherland. He wishes to have the saloon kept open on Sunday, not for the purpose of revelry or debauch, but as a meeting place for friends and neighbors, and he looks upon it as his club, where he may associate in a friendly way with acquaintances, sip his beer, and smoke his pipe. He views it purely as a social matter. During all these years no drunkenness or disorder has resulted. Ardent temperance people, seeing that no evil results follow this practice in this community, have ceased all agitation on the subject. In short, the public sentiment of the city is in harmony with the view suggested by the applicant in his testimony. The applicant testified that as a matter of personal preference he would much prefer to close up his place on Sunday, but that when his 2,000 competitors kept open he was obliged to do likewise or lose his patronage; that, if any effort were to be made on behalf of the municipality or the public to enforce the Sunday closing law, he would gladly acquiesce and close his place.

Upon the hearing the learned district attorney was forced to admit that, in view of the state of public opinion in the city of Milwaukee, it would be impossible for the executive branch of the state government to enforce the Sunday closing act in this community. .Public sentiment is still the all-compelling power, as it was when the Roman maxim proclaimed that "the voice of the people is the voice of God." Any Legislature that establishes police regulations in defiance of public sentiment must suffer the humiliation of seeing their mandate disregarded. The question is whether, under all these circumstances, the court should find that the applicant has not behaved himself as a man of good moral character during the five years last past.

Let us now refer to the statute. This act requires that two witnesses shall depose that they each have personal knowledge that petitioner is a person of good moral character, and that he is in every way qualified in their opinion to be admitted as a citizen of the United States. By subdivision 4 of section 4 it is provided:

"It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he has resided continuously within the United States five years at least, and within the state or territory where such court is at the time held, one year at least, and that during that time *he has behaved as a man of good moral character* and attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same."

It will thus be perceived that Congress has drawn the distinction between moral character as an ultimate fact and good reputation based on behavior, which must be an inference. The court merely passes upon *behavior,* for no human tribunal can search the heart where character is presumed to reside. What is meant by good moral character, as the terms are used in this act? What standard does the statute contemplate? It is plain that it does not require the highest

degree of moral excellence. A good moral character is one that measures up as good among the people of the community in which the party lives; that is, up to the standard of the average citizen. Ordinary care is the test of liability in every case of negligence. This standard is arrived at, not by the overcautious or the reckless man, but by the average man, representing the great mass of men. So here, where the law says a good moral character, it means such a reputation as will pass muster with the average man. It need not rise above the level of the common mass of people.

Applying this test to the particular case, we find that the views and behavior of the applicant are in accord with the overwhelming majority of the people in this community. It is not contended that the applicant must be able to rise to such moral elevation that he may analyze, criticise, and reject the prevailing opinions and settled convictions of his fellowmen, and in the clear blue of righteousness choose for himself a course of action dictated by his quickened conscience. To meet such a test a man must be a philosopher, while the statute is satisfied with a citizen whose behavior is up to the level of the average citizen. There is nothing in the mental attitude of the applicant, as disclosed by his examination, which would brand him as a deliberate lawbreaker. His willingness and desire to obey the law, if insisted upon by the constituted authority, distinguishes this case from the Illinois case [1] which has been pressed upon our attention. In that case the front door of the saloon was closed, indicating a knowledge of the law and a pretended desire for its enforcement, while the open back door indicated stealth and a deliberate purpose to circumvent the law. This was coupled with a solemn determination on the part of the applicant to adhere to his lawless course at all hazards.

It must be remembered that the act of keeping open one's saloon on the Sabbath is unlawful, not in and of itself, but merely because it has been prohibited by an arbitrary act of the Legislature. Men of the highest moral character always have and always will differ as to the proper enforcement of sumptuary and police regulations. I cannot see that the applicant should be denied citizenship because he has fallen in with the general public sentiment of the community in which he lives. There is in the conduct and attitude of the applicant no moral turpitude, and nothing evincing a calloused conscience, and it would not, in my judgment, be a fair construction of the act of Congress to require the applicant to rise above his environment and show by his behavior that his moral character was above the level of the average citizen.

For these reasons, the objections will be overruled, and the applicant will be admitted to citizenship.

[1] United States v. Hrasky, 240 Ill. 560, 88 N. E. 1031, 130 Am. St. Rep. 288.